## In re AMERICAN CASUALTY COMPANY,

AMERICAN CASUALTY COMPANY, Plaintiff–Appellant, (86–1728), Plaintiff–Appellee, (87–1125),

v.

CITY OF DETROIT, Defendant–Appellee, (86–1728), Defendant–Appellant, (87–1125),

Brady Mechanical, Inc., Defendant.

Nos. 86–1728, 87–1125.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 22, 1987.

Decided July 8, 1988.

Paul A. Callam (argued), Jenkins, Augsperger, Reebel & Zameck, Southfield, Mich., Merle R. Jenkins, for American Cas.

Alberta P. Whitfield, City of Detroit Law Dept., Detroit, Mich., Charles A. Moore (argued), for City of Detroit.

Before LIVELY and WELLFORD, Circuit Judges; and BROWN, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Plaintiff, American Casualty Company ("American"), appeals from a judgment holding it liable as surety on a performance bond for two construction contracts between Brady Mechanical, Inc. ("Brady") and the City of Detroit ("City"). In a consolidated case, the City of Detroit as defendant and third party plaintiff, appeals the district court's denial of its claim for attorney fees and additional costs. Two contracts for the development and refurbishment of a housing project in Detroit were awarded in May of 1982 to Brady. American issued performance and payment bonds to the City to guarantee the satisfactory completion of the Brady contracts.

The housing project consisted of numerous buildings, heated by means of a centralized steam plant. The steam was distributed from the plant through 10″ high pressure steam lines to various substations located throughout the project, where the pressure was reduced and the steam subsequently distributed to individual buildings. Brady's contract called for replacement of the main high pressure line and various low pressure lines which were old and in a state of serious disrepair, and for the rerouting of low pressure lines away from certain buildings slated to be demolished as part of the renovation project.

After Brady's commencement of its work under the contracts in the spring of 1982, Brady began to experience problems and disputes. In order to perform its work, Brady required certain periods of time to shut down the lines and cut off the steam heat source. According to Brady, it was understood that the steam would be shut down throughout the entire summer of 1982. According to the City, however, it was understood that the steam would be shut down only during limited periods, not for the entire summer, and certainly not during the winter, because the steam lines were the source for both heat and hot water in the housing project. Eventually Brady attempted to construct a temporary steam line for use while the primary steam line was shut down. The temporary steam line was ineffective. The parties dispute about responsibility for the cost of the temporary lines. Brady contends that due to problems with the existing structures, it was prevented from constructing adequate temporary lines. The City contends that Brady used an inadequate design for the temporary system. The memorandum of a conference between Brady and the City, dated April 12, 1982, states: "Utility service (hot water) must be maintained with *minimal* disruption to area residents during the construction activities."

In addition to the problems about shut downs, disputes between the City and Brady arose with respect to payment of Brady's invoices. Early during the course of the project, representatives of Brady had dealt with Odell Jones, the construction manager. When it appeared that extra work would be necessary, Jones simply instructed Brady to add the cost to various line items on Brady's application for payment. This happened on several occasions. When the City realized what was occurring, it put a halt to the practice and required Brady to comply thereafter with the contract provisions requiring written change orders. The City, moreover, undertook a review of the initial applications for payment which had included charges for

extra work. As a result of this review and examination of records, payments to Brady were delayed. There were other delays in payments to Brady, which the City contends were the result of Brady's failure to supply adequate documentation in conjunction with applications for payment. Of the nineteen payments made during the construction period, only seven were made approximately on time in accordance with the contract requirements that they were to be made at approximate thirty day intervals. Six payments were made two months after receipt of Brady's application for payment. The remainder were made about three months following receipt of Brady's application for payment. Brady maintains that the severe effect on its cash flow of these payment delays threatened its economic survival, and that the City used Brady's financial distress to coerce submission to unreasonable change orders which reduced its legitimate claims for extras.

The mechanical engineer designer of the project, Ellis, Naeyaert, Genheimer Associates, Inc. ("Ellis"), which was retained by the City for assistance in review of the progress and quality of Brady's work, reviewed requests for payment. The Ellis firm questioned Brady's method of compacting the backfill of pipe trenches. Subsequent tests by a geotechnical engineering firm demonstrated that based on the random testing, substantial evidence existed that compaction requirements and backfill quality requirements were not being met. The City instructed Brady to correct these alleged defects. Brady denied the charges, refuting its non-conformance and set forth conditions with which the City was expected to comply before Brady would or could complete the project. The City notified Brady that its conditions were unacceptable and that it intended to notify American, the bonding company. Brady ceased operations on the project in September of 1983 and abandoned the site, leaving some of its equipment and unused materials ordered on the job.

During negotiations between the City, Brady and American, the latter party filed suit in the district court seeking a declaratory judgment with respect to its liability on the performance bonds for the contracts. The City responded by a counterclaim, seeking damages for Brady's breach of contract, impleading Brady as a third party defendant.

At the conclusion of a bench trial, the district court held that Brady, rather than the City, had breached its contract through defective work and by abandoning the work in violation of its contract without justification; that the City was entitled to damages which were supported by evidence in the amount of $1,207,343 and was further entitled to costs and attorney fees. The district court subsequently reduced the judgment to $709,504.42, based upon evidence that approximately $500,000, consisting of retainage and unearned funds from the two contracts, was in the possession of the City and should be credited against the judgment. In connection with the finding that Brady, rather than the City, had materially breached the contracts, the district court held that the City's delays in making payments to Brady and limitations of steam shutdowns were not a material breach of the contract nor did the City prevent or interfere substantially with Brady's performance. The district court also held that Brady's remedy in the event of a material breach by the City, had there been such a breach, was to pursue the provisions of ¶ 10 of the general conditions of the contract which provided for dispute resolution.

With respect to that portion of the judgment concerning attorney fees and costs, the court directed that a magistrate conduct a hearing to determine the appropriate amount to be paid to the City for its legal costs. Following a hearing, the magistrate determined that the City was entitled to an award of $235,223.75 for attorney fees and $275,390.61 in addition for costs. On American's motion, the district court set aside the magistrate's award and substituted only "statutory costs" to the City, on the basis that the City had filed its application for attorney fees too late under the

applicable local rules [1]. The district court also held that the City had failed to plead specifically its claim for attorney fees in compliance with Rule 9(g) of the Federal Rules of Civil Procedure, citing also in support of its decision Michigan cases dealing with indemnification, *Hayes v. General Motors Corp.*, 106 Mich.App. 188, 308 N.W.2d 452 (1981), and *Harbenski v. Upper Pennisula Power Co.*, 118 Mich.App. 440, 325 N.W.2d 785 (1982). The district court ruled that the City could not recover attorney fees and costs from American under its indemnity agreement.

American appeals from the district court's judgment of liability and its assessment of damages for breach of contract on the part of Brady. The City appeals the district court's denial of attorney fees and costs. We affirm in part and remand as to damages.

## I. AMERICAN'S APPEAL

### A. *Liability*

Because jurisdiction in this case is based upon diversity of citizenship, state law governs matters of substance while federal law dictates procedural issues. *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Consequently, we look to Michigan law to determine whether the issue of whether there was a material breach of contract is one of fact or law. *See Adams Apple Distributing Co. v. Papeleras Reunidas*, 773 F.2d 925, 929 (7th Cir.1985). Under Michigan jurisprudence, whether there has been a substantial performance of a contract or, to the contrary, a material breach, is a question of fact for the trier of fact. *Pratt v. Van Rensselaer*, 235 Mich. 633, 209 N.W. 807 (1926). A finding by the district judge acting as the trier of fact that a party prevented or rendered impossible performance by another party to the contract "will not be reversed unless the evidence clearly preponderates in the opposite direction." *Kiff*

*Contractors, Inc. v. Beeman*, 10 Mich.App. 207, 159 N.W.2d 144, 146 (1968).

Our standard of review, however, is determined by the Federal Rules of Civil Procedure. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). The standard of review applicable to the district court's determinations with respect to material breach and impossibility of performance by this court is whether the district court's findings of fact were "clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R. Civ.P. 52(a). Interestingly, the rule in Michigan with respect to assessing the findings of the trial judge is in conformity with our usual standard:

> ... unless the findings are against the preponderance of the evidence, the judgment is not disturbed on appeal.

*Toussaint v. Conta, et al.*, 292 Mich. 366, 290 N.W. 830, 831 (1940). *See also Detroit Indep. Sprinkler Co. v. Plywood Prods. Corp.*, 311 Mich. 226, 18 N.W.2d 387 (1945); *Vannett v. Michigan Pub. Serv. Co.*, 289 Mich. 212, 286 N.W. 216, 218 (1939).

■ Brady argues that its abandonment of the contract was fully justified because the City had already materially breached the contract by failing to pay according to contract terms and by refusing to allow steam shutdowns, thus rendering performance impossible. The district court concluded that while there were payment delays, they were the result of the City's inefficient bureaucracy and were not material delays. The district court concluded, moreover, that Brady itself had on occasion held up the procedures for approving its applications for payment. There was conflicting testimony in the record with regard to placing of blame for the payment delays, which unquestionably contributed to Brady's difficulty in performing. There is testimony from Brady's witnesses that it sub-

---

**1.** Rule 17(n), Local Rules of the United States District Court for the Eastern District of Michigan provides:

Except as otherwise provided by statute or by order of the court, an application for attorneys fees by a prevailing party together with a

supporting memorandum shall be filed within thirty days after the entry of judgment. Failure to file the application within the time specified shall be considered a waiver of the right to attorney fees.

mitted its applications for payment in a timely fashion, complete with supporting documentation. The testimony of the City's witnesses, on the other hand, was that the delays in payment were the result of the failure of Brady to provide adequate documentation and were also the result of the perceived need to conduct investigations into the quality of Brady's work prior to approval of the applications for payment.

■ The longest delay in payment was the result of the inclusion by Brady of extra charges on an application for payment which had not been approved by a written change order pursuant to the contract provisions. American, standing in the shoes of Brady, argues that the requirement of a written change order had been waived by the City through its representative, the construction manager Odell Jones. The district court held, however, that this particular delay was attributable to Brady for failing to obtain the written change order. The district court concluded that Odell Jones' verbal approval of the charges for extra work did not constitute a waiver by the City of the change order requirement. "Waiver is a mixed question of law and fact. It is the duty of the court to charge and define the law applicable to waiver, but it is the province of the jury to say whether the facts of a particular case constitute waiver as defined by the court." *Cascade Elec. Co. v. Rice,* 70 Mich.App. 420, 245 N.W.2d 774, 776 (1976) (citations omitted).

The City does not dispute that Jones originally verbally approved the charges for extra work submitted by Brady in December of 1982. There is no dispute but that Jones was the City's representative on the site. In *Cascade,* the Michigan court held that the requirement for a written change order may be waived by the person benefitted by such a provision. While the burden is upon the plaintiff to establish that the change orders and extras claimed, not authorized in writing, were in fact authorized by verbal agreement or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage, the plaintiff has evidently carried that burden in this particular instance. *See Cascade,* 248 N.W.2d at 776. The City took steps to rectify the verbal authorizations by Odell Jones as soon as it discovered they were being made. Extra work, however, had already been verbally authorized by Jones, and Brady was paid for this work, at least in part. It seems clear to us that the City had waived its requirement of a written change order in respect to Jones' actions in this respect at least. The City's subsequent months long delay in ultimately paying for the extra work was a breach of the contract by the City. We must then consider whether that breach alone rises to the level of a *material* breach on the part of the City, since we find no clear error in the district court's conclusion that the remainder of the City's conduct was substantially in conformance with contract requirements insofar as payment for Brady's proper work and services were concerned.

■ American also argues that the district court judge erred in finding that Brady had materially breached the contract by doing defective work. This contention is based on conflicting testimony and disputed proof; the trial judge was in the best position to determine credibility in this situation. We find no clear error in respect to the district court's determination in this regard.

■ Brady (and American) further asserts that Brady's abandonment of the contract was justified because of the City's failure to provide for steam shutdowns. The conference memorandum made before work began indicates that the provision of hot water to tenants of the housing project was important to the City and was not to be substantially interrupted. Brady was thus put on notice that an uninterrupted supply of steam and of hot water to the tenants was critical. One of Brady's witnesses, George Coomb, testified that for the most part the City did provide for steam shutdowns, although not a total shutdown of the steam, and that only on three occasions was excavation performed in preparation for replacement of the steam lines when no steam shutdown was provid-

ed. As the district court notes, testimony proffered by both the plaintiff and the defendant indicate that at times the shutdowns were granted without problem, but that at times the City withheld permission to shut down the steam for the protection of the housing project tenants. We cannot find error in the district court decision that there was no material breach by the City in this respect so as to justify abandonment by Brady.

We find no error in the district court's conclusion, based on facts which we also have determined not to be clearly erroneous, that Brady was not excused from performing the contract with the City by reason of impossibility of performance or because of duress. We recognize that Brady was placed under financial pressure and may have expected some relief by reason of the City's delay in payments in some instances. This situation with respect to lateness or delay in payment did not, then, relieve Brady from performance nor serve as justification for quitting the job. Paragraph ten of the contract (the disputes clause)[2] provided Brady the proper basis for seeking relief or an adjustment to the contract price if and as Brady were aggrieved by the City's delay, rather than walking away from the project.

In sum, we conclude that there is no demonstrated error in the district court's conclusion that Brady was liable in some amount of damages under the contract and under the circumstances in respect to Brady's failure to complete the work. There was no error in the conclusion that the City was not guilty of such a material breach on

its part that justified Brady's ultimate action, nor did the City render Brady's performance impossible. We must then consider the issue of the damages proven by the City as a proximate result of Brady's failure to perform.

B. *Damages*

 American maintains strenuously that the district court's determination of damages in this case is not supported by the evidence adduced by the City. Whether damages are adequately proven is a question of law and thus the "clearly erroneous" standard is inapplicable. *Detroit Power Screwdriver Co. v. Ladney*, 25 Mich.App. 478, 181 N.W.2d 828 (1970). The basic testimony with respect to the *amount* of damages suffered by the City is that of an expert witness, J. Edward Genheimer, who testified that the City had received bids for each of four sections of work remaining to be performed after Brady's departure, but that only two of the bids had been determined to be acceptable. A fifth section estimate of damages was based upon a "very broad approximation." The district court pressed Genheimer to provide it with evidence concerning the unacceptable bids, as well as those that were acceptable. Ultimately, after the district court's prodding, Genheimer testified that those bids for all phases of remaining work represented a reasonable estimate of the cost of completion of the work. Plaintiff objected to the introduction of some evidence, particularly since some of the bids

---

**2. 10. DISPUTES**

a. All disputes, other than those required to be handled under Paragraph 31 of the General Conditions, and all claims for alleged breach of contract shall, within ten days of commencement of dispute, be presented in writing to the Contracting Officer for decision; but in the meanwhile, the Contractor shall proceed with the work as directed.

b. The Contractor shall submit in detail his claim and his proof thereof. The LHA shall, with reasonable promptness, after obtaining the approval of HUD, render its decision to the Contractor in writing.

c. If the Contractor does not agree with any decision of the Contracting Officer, he shall except that decision from the final release.

d. Provided the Contractor has (1) given notice of any dispute within the limit stated above; (2) taken exception to the Contracting Officer's decision in his release; and (3) brought suit within 120 days after receipt of final payment under this contract or within six months of a written request by the LHA that he submit a final voucher and release, whichever time is the lesser, then the Contracting Officer's decision shall not be final and conclusive but the dispute shall be tried in court on its merits. In the event the above conditions precedent have not been met, the Contractor hereby agrees that his noncompliance with the conditions precedent constitutes a waiver of his right to assert said claim.

upon which a damage estimation was made were described as unsatisfactory.

There is a very real question as to whether the City proved its damages with the requisite degree of certainty. *See In Re Burg's Estate*, 282 Mich. 304, 276 N.W. 458 (1937). While the plaintiff did not present any proof to rebut the figures provided by Genheimer, his testimony is a shaky basis at best upon which to assess damages. American contends in this regard that because its motion to compel discovery on certain phases of the issue of damages was never granted, it had no adequate basis of knowledge about the City's damages claim and could not adequately respond or rebut. We find some merit in these contentions by American on the question of damages.

█ The district court entered the amended judgment of damages, after reducing the amount by $500,000 on June 22, 1986, which it based upon the City's retention of approximately that amount in unexpended project funds. American appealed from this award of damages, but the City filed no cross appeal. The other appeal in this case was taken by the City from the district court's refusal to grant its motion for attorney fees, not by reason of the reduced judgment. The City, then, is reduced to the posture of arguing that the amended and reduced amount of $709,-504.42 in damages should not be disturbed.[3] It has no basis in this appeal to request, as it does in its brief at page 23, that "this Court in its review of this Matter affirm the *original* judgment of the Court below." (Emphasis added).

The City acknowledges in its brief that the figures submitted by Genheimer were not "acceptable to the City of Detroit for bidding purposes," and that "he felt they could get a better price" than the bids he relied upon to estimate the damages. Brief of City of Detroit at 21. The burden is upon the City to establish with some reasonable degree of certainty the nature and extent of the damages. *Detroit Indep. Sprinkler Co.*, 18 N.W.2d at 389. No cred-

it was given plaintiff for materials ordered and on the job site when Brady left the site; no explanation is given as to why plaintiff was not entitled to some credit in this regard. The cost of one part of the remaining work was estimated at $340,000 whereas that work was bid at $167,000, less than half of this estimate. A substantial part of the damages award was based, not on the expert's calculated appraisal of the cost to complete Brady's contracts, but rather upon a very "rough estimate." We are not satisfied on this record that the city has proved its damages with reasonable certainty for the reasons indicated.

█ We have noted, furthermore, in our discussion of liability that the City itself in one respect was guilty of a breach by reneging on its construction manager's approval of certain extras and changes performed by Brady in reliance on this approval. At the same time, we found no error in the district court's conclusion that there was no substantial or material breach by the City so as to justify the failure of Brady to perform or to complete the undertaken work. To the extent, however, Brady was damaged by the delay in payment on the extra work approved by Odell Jones, there must be a reduction in the damages ultimately proved by the City to be due as a proximate cause of Brady's default. This is an additional basis for our remand with regard to the damages issue.

We must therefore remand the case for a further hearing and consideration of reasonable damages to be established by the City. In no event will such damages, however, exceed the amount of $709,504.42, which is the limitation imposed based upon the circumstances and the posture of this case on appeal.

## II. CITY OF DETROIT'S APPEAL

█ It was not until forty-one days after entry of the amended judgment that the City moved for attorney fees and costs. Local Rule 17(n) of the court sets a thirty

---

**3.** In any event, although we are not called upon to decide that question, we observe no demonstrated error in the district court's reduction of

damages by $500,000 for the reasons stated by the court.

day deadline for such an application. The district court ruled the application to be untimely and denied the requested relief based on principles of waiver. In *Trepel v. Eaton*, 767 F.2d 922 (6th Cir.1985) (unpublished opinion),[4] we upheld the district court's denial of fees as untimely under this same local rule, finding the district court's interpretation of its own rules appropriate.

Further, it appears that under the law of this circuit, the City's motion for attorney fees should not be characterized as made pursuant to Fed.R.Civ.P. 59(e). *Morgan v. Union Metal Mfg.*, 757 F.2d 792, 794–95 (6th Cir.1985); *see also Exchange Nat'l Bank of Chicago v. Daniels*, 763 F.2d 286 (7th Cir.1985) (distinguishing *Hairline Creations, Inc. v. Kefalas*, 664 F.2d 652 (7th Cir.1981), which held that motions for attorney fees must be made within the 10–day limit of Rule 59(e), as applicable only in the context of patent and trademark litigation). If not so characterized, "the district courts remain free to adopt local rules establishing timeliness standards for the filing of claims for attorney's fees." *White v. New Hampshire Dep't of Employment Security*, 455 U.S. 445, 454, 102 S.Ct. 1162, 1167–68, 71 L.Ed.2d 325 (1982) (holding Rule 59(e) inapplicable to post-judgment requests for attorney fees under 42 U.S.C. § 1988).[5] In any event, the City failed to comply with the 10–day time limit imposed by Rule 59(e) upon motions to alter or amend the judgment. Further, even if the City's motion is treated as a motion under Fed.R.Civ.P. 54(d), which provides for the award of "costs," district courts are "free to adopt local rules establishing standards for timely filing of requests for costs." *White*, 455 U.S. at 455 n. 17, 102 S.Ct. at 1168 n. 17.

■ There are additional grounds of support for the action of the district court in this regard. Such a claim is in the nature of special damages and so should be specifically pleaded if they are to be claimed. "When items of special damages are claimed, they *shall* be specifically stated." Fed.R.Civ.P. 9(g) (emphasis added). American promptly objected to the belated assertion of special damages by the City.

In a comparable diversity case, plaintiff sought to amend its complaint and to assert a new claim for attorney fees following a jury verdict awarded plaintiff for compensatory and punitive damages. The court in *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 717 (4th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983), declined to permit this amendment since the original complaint at the trial had not specifically set out this special damage contention. *Atlantic Purchasers* was cited in 5 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure* § 1310 (Supp.1987), in that authority's discussion of consequences of failure to plead special damages. *See also Maidmore Realty Co., Inc. v. Maidmore Realty Co., Inc.*, 474 F.2d 840, 843 (3d Cir.1973) (National Bank of North America, Intervenor):

> Claims for attorney fees are items of special damage which must be specifically pleaded under Federal Rule of Civil Procedure 9(g). In the absence of allegations that the pleader is entitled to attorney's fees, therefore, such fees cannot be awarded.

(Citations omitted). *Maidmore* reached this decision despite the fact that the bank in its interpleader claim was relying upon a mortgage which contained an attorney fee provision in the event of necessary collection efforts. See also, to this same effect, *Western Casualty & Surety Co. v. Southwestern Bell Tel. Co.*, 396 F.2d 351 (8th Cir.1968).

Finally, although it is not necessary for us to decide this issue involving interpreta-

---

**4.** This decision affirmed the decision of the district court reported at 101 F.R.D. 539 (E.D.Mich. 1984), which held that the local rules of that court precluded an untimely claim for attorney fees.

**5.** The United States Supreme Court has granted certiorari to consider whether a different rule applies when fees are not provided for independently, as by § 1988. *Budinich v. Becton Dickinson and Co.*, —— U.S. ——, 108 S.Ct. 226, 98 L.Ed.2d 185 (1987) (granting certiorari to consider, 807 F.2d 155 (10th Cir.1986)).

tion of the City's contract indemnity provision with Brady, we believe that Michigan law cited by the district court may also preclude the City's recovery of attorney fees on the basis of this rationale. In any event, we conclude that the district court was not in error in denying the attorney fees.

We AFFIRM the district court's decision that Brady (and American, as its surety) is liable for its failure to perform. We REMAND, however, for a proper determination of damages consistent with the reasons herein set forth. Finally, we AFFIRM the district court's denial of attorney fees to the City of Detroit.

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**STATE OF MICHIGAN,**
**Defendant–Appellant.**

**No. 87–1858.**

United States Court of Appeals,
Sixth Circuit.

Argued April 6, 1988.

Decided July 8, 1988.

Rehearing Denied Aug. 23, 1988.

Richard R. Roesch, Robert C. Ward, argued, Atty. Gens. Office, Lansing, Mich., for defendant-appellant.

John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Richard A. Correa, Tax Div.-Dept. of Justice, Michael L. Paup (Lead), Chief, Appellate Section, Michael C. Durney, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, William S. Rose, Gary R. Allen, David E. Carmack, John J. McCarthy, argued, Dept. of Justice, Tax Div., Washington, D.C., for plaintiff-appellee.

Before MARTIN, WELLFORD, and NELSON, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

The State of Michigan appeals the district court's decision declaring unconstitutional certain provisions of the Michigan General Sales Tax Act, Mich.Comp.Laws § 205.51 *et seq.* The court held that the incidence of the tax levied under this statute falls on federal credit unions which the court concluded were federal instrumentalities immune from state taxation under the Supremacy Clause of the United States Constitution. 635 F.Supp. 944 (1985). We affirm.

The United States brought this action in federal district court on behalf of approximately 238 federally-chartered credit unions located in Michigan. A federal credit union is a non-profit, cooperative association organized under the Federal Credit Union Act, 12 U.S.C. § 1752 *et seq.*, "for the purpose of promoting thrift among its members and creating a source of credit for provident or productive purposes." *Id.* at § 1752(1).

The complaint, filed at the request of the National Credit Union Administration, a federal agency, sought a declaratory judgment that Michigan's sales tax law violated the Supremacy Clause because it effectively taxed purchases made by federal credit unions in Michigan. The United States alleged that the law was unconstitutional because federal credit unions are federal instrumentalities entitled to the same immunity from state taxation as the United States. Therefore, the United States claimed, because the legal incidence of this sales tax falls on the purchaser, the tax could not be constitutionally imposed on purchases by federal credit unions. The United States also alleged that the state's sales tax statute unconstitutionally discriminates against the United States in that no exemption from the tax is extended to federal credit unions while Michigan and its institutions are exempt from the sales tax.

The district court granted the United States' motion for partial summary judgment and denied Michigan's summary judgment motion. The court held, first, that the Tax Injunction Act, 28 U.S.C. § 1341, did not preclude it from asserting jurisdiction over the case. The court then held that federal credit unions are federal instrumentalities immune from state taxation under the Supremacy Clause. Next, the district court concluded that the legal incidence of Michigan's sales tax falls on the purchaser, and that, therefore, the law unconstitutionally imposed a tax on federal instrumentalities. Finally, the court found that the six-year statute of limitations for actions by the United States for recovery of monies, set forth in 28 U.S.C. § 2415, applies to this case, rather than the state's four-year statute of limitations for tax refund cases. The court concluded that, in light of these holdings, it need not consider the United States' alternative argument, that the sales tax, as applied, unconstitutionally discriminates against federal credit unions.

The parties subsequently stipulated that the amount of the refund, properly calculated as of July 1, 1986, was $2,781,646.67, plus interest. On June 30, 1987, the district court entered a final judgment in ac-

cordance with that stipulation. Michigan now appeals.

■ Michigan first challenges the district court's jurisdiction. Under 28 U.S.C. § 1345, federal district courts "have original jurisdiction of all civil actions, suits or proceedings commenced by the United States." Michigan argues, however, that the Tax Injunction Act, which prohibits federal district courts from enjoining, suspending, or restraining "the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State," 28 U.S.C. § 1341, precludes the United States from maintaining this action. The state recognizes that the United States is not subject to this limitation if the federal government is challenging the constitutionality of a state tax being levied on the United States or on one of its agencies or instrumentalities, *see, e.g., Dep't of Employment v. United States,* 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966), but Michigan claims that this jurisdictional determination depends upon a finding that federal credit unions are, in fact, federal instrumentalities.

Michigan's position is untenable for it conflates a jurisdictional issue and a substantive determination. The Supreme Court refuted a similar argument in *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). In that case, the defendants had argued that the district court had properly dismissed the plaintiff's complaint for lack of federal jurisdiction because it failed to state a cause of action. The court reversed, holding that whether the complaint stated a valid claim could only be decided after, and not before, the district court had assumed jurisdiction over the controversy. "If the court does later exercise its jurisdic-

tion to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want or jurisdiction." *Id.* at 682, 66 S.Ct. at 776.

The Court recognized only two exceptions to this principle: where the alleged claim under the Constitution or federal statutes is clearly immaterial and made solely to obtain jurisdiction; or where the claim is wholly insubstantial and frivolous. *Id.* at 682–83, 66 S.Ct. at 776. Michigan did not and could not argue that either of these exceptions is applicable here. Therefore, the district court correctly ruled that the Tax Injunction Act did not bar the United States from maintaining this action, and the court properly exercised jurisdiction over this case under 28 U.S.C. § 1345.

■ Michigan's jurisdictional challenge is also unavailing in light of our decision regarding the status of federal credit unions. The state contends that the district court erroneously concluded that federal credit unions are federal instrumentalities entitled to immunity from state taxation. We are not persuaded.

In the famous case of *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), the Supreme Court established the doctrine of federal immunity from state taxation. In that case, the Court held that, absent Congressional consent, the federal government and its instrumentalities are immune from state taxation under the Supremacy Clause of the Constitution. *Id.* Congress clearly has not consented to state taxation of federal credit unions; to the contrary, Congress has expressly prohibited state taxation of federal credit unions, except for *ad valorem* taxation of real and personal property. 12 U.S.C. § 1768.[1]

---

1. Section 1768 provides in part that "Federal credit unions ..., their property, their franchises, capital, reserves, surpluses, and other funds, and their income shall be exempt from all taxation now or hereafter imposed by the United States or by any State, Territorial, or local taxing authority; except that any real property and any tangible personal property of such Federal credit unions shall be subject to Federal, State, Territorial, and local taxation to the same extent as other similar property is taxed."

In *First Agricultural National Bank v. State Tax Commission,* 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968), the Court concluded that a similar statutory exemption rendered it unnecessary for the Court to reach the constitutional question of whether national banks are nontaxable federal instrumentalities. *Id.* at 341, 88 S.Ct. at 2175. Here, however, we are compelled to resolve the issued because the status of federal credit unions affects the analysis of a subse-

Therefore, if federal credit unions are federal instrumentalities, they are entitled to constitutional, as well as, statutory, immunity from state taxation.

Unfortunately, "there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality." *Dep't of Employment v. United States*, 385 U.S. at 358–59, 87 S.Ct. at 467. The leading cases suggest that we examine the purpose for which federal credit unions were created, that we determine whether they continue to perform that function, and that we assess the federal government's control over and involvement with these organizations.

One significant factor in determining whether a particular entity is a federal instrumentality is whether it performs an important governmental function. *See Federal Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941). During the depths of the Depression, two of the many problems plaguing the national economy were scarce credit and high interest rates. In order to deal with these problems, Congress authorized the establishment of federal credit unions. S.Rep. No. 555, 73d. Cong., 2d Sess. (1934). These cooperative associations were designed to encourage and enable average citizens to pool their resources. Through federal credit unions, therefore, the federal government makes credit available on liberal terms and at low rates of interest to middle-class Americans who, because they frequently lack adequate security, might otherwise have to turn to small loan financiers who can extort excessive interest rates in times of unexpected need.

In *Federal Land Bank v. Bismarck Lumber Co.*, the Supreme Court held that a virtually-identical fiscal function was indicative of tax-immune instrumentality status. The Court concluded that federal land banks were " 'instrumentalities, engaged in the performance of an important governmental function,' " 314 U.S. at 102, 62 S.Ct. at 5 (*quoting Federal Land Bank v. Priddy*, 295 U.S. 229, 231, 55 S.Ct. 705, 706, 79 L.Ed. 1408 (1935)), because "[t]hrough the land banks the federal government makes possible the extension of credit on liberal terms to farm borrowers." *Federal Land Bank v. Bismarck Lumber Co.*, 314 U.S. at 102, 62 S.Ct. at 5. Thus, federal credit unions, which provide a similar public service to a broader cross-section of the nation's citizens, also perform an important governmental function.

Michigan attempts to divert our attention from this fundamental fact by arguing that federal credit unions are no longer the small, simple thrift institutions that the sponsors of the Federal Credit Union Act intended to create. The state contends that, because these coopertives now offer a variety of increasingly-sophisticated financial services, essentially those also offered by private banks, federal credit unions do not deserve tax-immune instrumentality status. This argument is not persuasive because the conclusion does not necessarily follow from the premise. Merely because federal credit unions have added other financial services to attract more members and remain competitive with other types of financial institutions does not undermine the central fact: federal credit unions were designed to perform and continue to perform an important governmental function.

Federal credit unions also perform another, though somewhat less significant, federal function. Under 12 U.S.C. § 1767, federal credit unions are authorized to act as fiscal agents of the United States and as depositories of public money. Those functions have been recognized by the Supreme Court as important purposes of the federal government. *See Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 209–11, 41 S.Ct. 243, 248–49, 65 L.Ed. 577 (1921).

In addition to this interaction with the federal government, federal credit unions are extensively regulated under federal law. *See* 12 U.S.C. § 1752 *et seq.* Such sweeping regulatory supervision was found to be especially significant by the Supreme Court in *Smith v. Kansas City Title & Trust Co.* Admittedly, many other busi-

quent issue, the appropriate statute of limita-

tions.