NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0124n.06
Filed: February 16, 2005

Nos. 03-6512 & 03-6540

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CROSSLEY CONSTRUCTION CORP., | ) | |
| | ) | |
| Plaintiff-Appellant/Cross-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF TENNESSEE |
| NCI BUILDING SYSTEMS, L.P., | ) | |
| | ) | |
| Defendant-Appellee/Cross-Appellant. | ) | OPINION |
| | ) | |
| | ) | |
| | ) | |

**Before: MOORE and GILMAN, Circuit Judges; and WEBER, District Judge.**[*]

**RONALD LEE GILMAN, Circuit Judge.** Crossley Construction Corporation brought a breach-of-contract action against NCI Building Systems, its supplier of roofing materials. NCI cross-claimed, demanding payment of the balance that it was due plus interest. The district court entered judgment in favor of NCI and ordered Crossley to pay the balance due as well as interest accumulated up to the start of the trial. For the reasons set forth below, we **AFFIRM** the judgment of the district court with regard to the breach-of-contract claims, but **REMAND** the case for further consideration of NCI's cross-claims pertaining to prejudgment interest and attorney fees.

---

[*]The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

## I. BACKGROUND

### A. Factual background

Crossley is a general contracting firm based in Knoxville, Tennessee. In January of 1997, Crossley entered into an agreement with the owner of the Greystone Lodge in Gatlinburg, Tennessee to construct a new registration building as well as to install new roofs on two existing buildings. Crossley's original roofing supplier was unable to provide the materials in sufficient time, prompting Crossley to contact NCI, a Houston-based metal supplier.

On February 3, 1997, Crossley's vice president, Don Crise, sent NCI a purchase order (No. 9703-7A) for various roofing materials. In response, an NCI representative, Daniel Stewart, contacted Crise and informed him that NCI's standard policy was for NCI to work only from its own contract, and not from a customer's purchase order. Stewart then sent Crise a proposed contract on NCI's own form on February 4. Crise returned the form the same day with his signature and, in his own handwriting, a notation reading: "See CCC PO # 9703-7A as being made part of this Agreement by executing this proposal. D.C." Upon receipt, Stewart called Crise and "again reiterat[ed] that his purchase order was not accepted and [would] not be part of [NIC's] proposal." Stewart also forwarded Crise, on February 7, another copy of the same NCI proposal that he had sent to Crise three days earlier. This transmission did not reference Crossley's purchase order. On February 10, Crise signed and returned NCI's contract without further revisions.

The subsequent chronology of events is greatly disputed. NCI contends that it timely delivered most of the materials and that any delays were attributed to Crossley's slowness in specifying the choice of a color for the roofing materials. It further claims that 84% of the roofing

panels were delivered to the site by May 8 (the contractual date of delivery) and that the remaining panels were delivered by June 3, which allowed Crossley sufficient time to finish the roof installations by the original completion date of July 3, 1997. Moreover, NCI asserts that it provided roofing panels built to the exact specifications as provided by Crossley, and that it was not informed of any alleged shortages or noncomformities until mid-June.

Crossley, in turn, contests each of these assertions. It argues that NCI provided "all the materials more than three months beyond the delivery deadline in the NCI contract." Furthermore, it contends that "NCI also materially breached the contract by failing to supply panels that were properly cut to fit the buildings under construction." Crossley also claims that NCI never delivered a needed set of shop drawings, which were crucial to the timely completion of the project. NCI, for its part, contends that the drawings were properly submitted and received.

On June 2, 1997, Crossley informed NCI that it considered NCI to be in breach of the contract and gave notice of an intent to withhold further payment. Two weeks later, on June 19, Crossley sent NCI an ambiguous notice that it anticipated a shortage of panels and trim. On July 11, NCI gave Crossley a notice of default for nonpayment and offered to fabricate more material on the condition that Crossley pay its outstanding balance of approximately $86,000.

**B.      Procedural background**

Crossley responded by filing suit against NCI in federal district court on April 3, 1998, claiming breach of contract and negligent misrepresentation. NCI replied with an answer and counterclaim, denying most of Crossley's factual assertions and demanding that Crossley pay the full outstanding balance plus interest. In a thorough and detailed opinion, the district court

determined that NCI had not breached the contract, and that it was entitled to the unpaid balance due plus interest accumulated up to the commencement of trial. This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review

"Because jurisdiction in this case is based upon diversity of citizenship, state law governs matters of substance while federal law dictates procedural issues. Consequently, we look to [state] law to determine whether the issue of whether there was a material breach of contract is one of fact or law." *In re American Casualty Co.*, 851 F.2d 794, 798 (6th Cir. 1988) (citations omitted). In Tennessee, issues regarding the construction of contracts are questions of law. *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) ("The ascertainment of the intention of the parties to a written contract is a question of law, rather than a question of fact."). Such questions of law are reviewed de novo. *Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 990 F.2d 865, 871 (6th Cir. 1993). The district court in the present case reached three legal conclusions when it determined (1) that the contract between NCI and Crossley came into existence February 10, 1997 as opposed to February 4, 1997, (2) that NCI did not breach its contractual obligations, and (3) that even if NCI did breach its contractual obligations, it was not liable for consequential damages.

### B.      The date of the contract

Crossley claims that its contractual relationship with NCI came into existence on February 4, 1997, when Crise incorporated Crossley's purchase order on NCI's contract form, and not on February 10, 1997, as the district court concluded. In support of this argument, Crossley contends

-4-

that "it was the intent of the parties to form an agreement using a combination of their respective forms. This contract included Crossley's standard purchase order form, including the delivery schedule deadlines supported by the clear contract provision that 'Time is of the Essence.'" Crossley also points to the Uniform Commercial Code provision contained in Tenn. Code Ann. § 47-2-207, which states that

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> (2) [A]dditional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

>> (a) the offer expressly limits acceptance to the terms of the offer;

>> (b) they materially alter it; or

>> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Crossley argues that because the purchase order constituted either a "definite and seasonable expression of acceptance" or a "written confirmation," the parties had a contract on February 4, 1997. As the district court noted, however, Tenn. Code Ann. § 47-2-207 applies only when

> an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed.

Tenn. Code Ann. § 47-2-207 cmt. 1. The key question is therefore whether an agreement had been reached by the parties before Crise added the purchase order in his handwritten note. If no agreement had been reached, then Crossley's purchase order cannot be said to be a "definite and

seasonable expression of acceptance," and the accompanying provisions of Tenn. Code Ann. § 47-2-207 are not triggered. *See, e.g. United Foods v. Hadley-Peoples Mfg. Co.,* No. 02A01-9305-CH-00111, 1994 Tenn. App. LEXIS 277, at \*14 (Tenn. Ct. App. May 20, 1994) (unpublished) (finding no "definite and seasonable expression of acceptance" when the two parties differed about the price on orders of cotton).

In the present case, there is substantial evidence indicating that NCI did not view Crise's handwritten incorporation of the purchase order on February 4, 1997 as a "definite and seasonable expression of acceptance." This evidence is described in great detail in the district court's opinion, making another exhaustive discussion unnecessary. Of particular importance, however, is Stewart's testimony that "[s]tandard policy with NCI at the time is [that] we do not work from our customers' purchase orders on a project of this magnitude. They need to sign our contract proposal." His immediate response to receiving NCI's own contract back with Crise's handwritten incorporation of the Crossley purchase order on it was to reject the revised terms. Stewart further testified that "we called Don [Crise] back, again reiterating that his purchase order was not accepted and will not be part of our proposal." Nowhere does Stewart indicate that the handwritten incorporation of the purchase order was viewed as an acceptance of any previously discussed agreement. To the contrary, his testimony indicates that inclusion of Crossley's purchase order into the final contract was explicitly rejected.

Moreover, even if the purchase order constituted a "definite and seasonable expression of acceptance," Crossley's argument is unpersuasive under Tenn. Code Ann. § 47-2-207(c), which limits the incorporation of additional terms where "notification of objection to them has already been

given or is given within a reasonable time after notice of them is received." Stewart's testimony establishes that he immediately objected to the incorporation of the purchase order into the contract.

Because the inclusion of the purchase order cannot be said to constitute a "definite and seasonable expression of acceptance," the provisions of Tenn. Code Ann. § 47-2-207 are not triggered. We therefore find no error in the district court's conclusion that the contract between Crossley and NCI was reached on February 10, 1997, not February 4, 1997.

**C.     NCI's alleged breach of contract**

Crossley next argues that, even if the February 10 agreement is controlling, NCI breached its contractual obligations by (1) delaying the delivery of the roofing panels, (2) failing to supply the correct number and specifications of the panels, and (3) failing to supply the necessary shop room drawings. The district court's opinion again provides an exhaustive analysis of the facts. With regard to the delayed delivery, the district court made the factual finding that the "[d]elivery of the panels was delayed because of the color selection." Indeed, both parties agree that NCI was not informed that the Greystone Lodge owner wanted a specific color for the roofing panels until February 24, 1997, some two weeks after the effective date of the contract. The Lodge owner, moreover, did not approve of NCI's suggested substitution until March 27, and NCI was not notified of his decision until April 1. Production of the roofing panels was therefore pushed back even further.

The contract is silent about the color of the roofing panels, stating only that the job called for "Standing Seam NCI Standard Kynar Color Roof System" and that "NCI shall not be responsible for any requirement not shown herein." Crossley, moreover, has no effective rebuttal to the district

court's conclusion that "neither side is solely at fault for the delays associated with the color selection and approval." Because the contract was silent about the roofing panels' color and because the evidence suggests that neither party was solely at fault, this delay cannot be the basis of a breach of contract.

Crossley's second claim is that NCI delivered unusable roofing panels built to the wrong specifications. But the evidence indicates that NCI fulfilled its contractual obligation by providing the panels that Crossley requested and by double-checking to make sure that the delivered panels conformed to the requested specifications. NCI draftsman Rick Shown testified that he "checked [and] rechecked the bill of materials against the panel takeoffs on the drawings and checked the packing tickets against the bill of materials. There was no omission[] of any panels whatsoever." When asked if there was any reason why the panels delivered might have been the wrong size and shape, Shown responded, "None whatsoever." By contrast, the district court found that Crossley failed to provide "any documentation which would provide specifics about the nonconforming goods," including "any specific information as to when the deliveries were made, how they were short, which panels were the wrong length, etc."

The evidence, moreover, indicates that Crossley dallied in informing NCI of any alleged shortages or noncomformities in the roofing panels. NCI, for example, was not notified of any problems until June 19, 1997, when it received a letter from Crise tersely warning that "[Crossley] anticipate[s] a shortage of panels and trim on the above referenced project." This letter was received after all of NIC's deliveries had been completed. Stewart, as NCI's representative, wrote back that he had visited the job site and had determined that panels from one building had been moved to

another. He had also seen bundles of panels on the ground. Stewart later wrote to Crise advising him that "all panels were produced according to cut lists provided by or signed off on by representatives on your firm . . . . [W]e will have to investigate what happened to this material." Crossley, on the other hand, can point to no evidence demonstrating that NCI failed to provide the necessary materials or that, if it did so fail, NCI was solely responsible. The district court committed no error in concluding that "Crossley has also not met its burden of showing that NCI breached the contract by supplying nonconforming goods and by failing to provide replacement goods."

The last area of dispute regarding NCI's contractual obligations is with respect to various project drawings that NCI was obligated to provide to Crossley. Crossley claims that NCI never delivered the drawings, thus preventing it from using them as "documentation on the site to use in checking the shipment [from NCI] to see if it contained all the material necessary when delivered." Rick Shown, however, testified that, to his knowledge, all of the drawings were delivered to Crossley and approved. And Steve Franklin, the subcontractor responsible of the roof erection, testified that he had not only seen the drawings, but had relied on them as he "built the building." Crossley's claim that the shop drawings were never received is therefore unpersuasive. We find no fault with the district court's conclusion that "Crossley has not met its burden of showing that NCI breached the contract based on any failure by NCI concerning project drawings."

## D.    NCI's liability for consequential damages

Crossley next argues that, assuming NCI breached its contractual duties, NCI should be held responsible for the consequential damages resulting from the breach. It contends that the clause in the contract specifying that "NCI shall not be liable for any consequential damages to buyer" is

inapplicable because, "if given the effect sought by NCI, it would leave Crossley with no effective remedy." Furthermore, Crossley argues that "the trial court should have found NCI's limitation of liability provision to be unconscionable under the facts and circumstances in the case."

Because the question of whether Crossley is entitled to consequential damages is a legal one, the district court's decision is reviewed de novo. NCI, however, did not breach the contract for all of the reasons discussed above. We therefore have no need to address the question of consequential damages.

**E.      Evidentiary determinations by the district court**

Crossley also asserts that the district court made two key evidentiary errors during trial. This court "review[s] factual components of the district court's evidentiary determinations under an 'abuse of discretion' standard, and review[s] its legal conclusions de novo." *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 661 (6th Cir. 2000).

Crossley first complains that the district court erred when it "discredit[ed] virtually all the live testimony in favor of the videotape deposition of a non-NCI employee." The videotaped deposition in question was that of Stewart, the former NCI employee who served as NCI's representative to Crossley in the early stages of negotiation. Without supporting authority, Crossley asserts that the "videotaped testimony should be reviewed de novo without any presumption of correctness to the lower court's credibility determination inasmuch as neither the appellate court nor the trial court actually saw Mr. Stewart testify live." This argument, however, is effectively undercut by the fact that Crossley did not object at trial to the use of the videotaped deposition. To

the contrary, Crossley excerpted various segments of the videotaped testimony in presenting its own case in chief.

Rule 103(a)(1) of the Federal Rules of Evidence provides that "error may not be predicated upon a ruling which admits or excludes evidence" unless a timely objection has been made. Crossley is therefore precluded from asserting this objection for the first time on appeal, unless it can show that it meets the "plain-error" exception of Rule 103(d) ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."). Crossley, however, does not argue that it has satisfied the plain-error standard, *see United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998), nor are we persuaded that Crossley's substantial rights were adversely affected by the district court's evaluation of the videotaped testimony.

Crossley further argues that the district court erred by not applying the "missing witness" rule. Under this rule, an "adverse inference is permitted from the failure of a defendant to call witnesses if they are 'peculiarly within [his] power to produce' and if their testimony would 'elucidate the transaction.'" *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973) (quoting *Wynn v. United States*, 397 F.2d 621, 625 (D.C. Cir. 1967)). Application of this rule, Crossley argues, would have meant that "NCI's failure to call any of its employees to testify impairs its evidence and enhances the testimony of Crossley witnesses who testified based on their personal knowledge from working at the site." The missing witness rule, however, does not *require* the trier of fact to draw a negative inference. To the contrary, the rule operates to *permit* the trier of fact to draw the negative inference. *Id.* Crossley, moreover, neither raised this objection at trial nor

-11-

presents more than unsupported assertions regarding what the NCI employees would have said. We therefore conclude that the district court did not abuse its discretion with respect to the missing witness rule.

## F. Prejudgment interest

In its order, the district court required Crossley to pay $86,131.21 for the balance due NCI plus interest that had accumulated to the date of trial, which started on February 8, 2001. NCI, in its cross-appeal, contends that the district court "erred by awarding prejudgment interest only up to the date of trial rather than the date of judgment, October 16, 2003." It argues that "unless prejudgment interest is awarded up to the date of judgment, NCI will not be fully compensated for its loss and Crossley will be given a windfall despite its unjustified retention of NCI's money."

"The primary purpose in awarding prejudgment interest is to assure that the plaintiff is fully compensated for the lost use of funds to which he or she was entitled." *Harrison v. Laursen*, 128 S.W.3d 204, 209 (Tenn. Ct. App. 2003). Prejudgment interest in a diversity action must be determined under state law. *Mass. Benefit Ass'n v. Miles*, 137 U.S. 689 (1891); *see Conte v. General Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000). In Tennessee, "[a]n award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998); *see also Alexander v. Inman*, 974 S.W.2d 689, 698 (Tenn. 1998) ("Under this deferential standard, an appellate court may not substitute its judgment for that of the trial court. Rather, an abuse of discretion occurs only when the evidence does not support the trial court's decision.").

In the present case, however, the district court did not explain why it awarded prejudgment interest only up to the commencement of trial.  Perhaps as NCI argued on appeal, the gap between the dates of trial and judgment was simply an oversight.  Logic would indicate, after all, that *prejudgment interest* should normally run to the date of judgment.  The district court's silence on this issue, however, prevents us from determining whether an abuse of discretion has occurred.  In the absence of an explanation for its rationale, we cannot afford the district court the substantial deference on this issue to which it is entitled under Tennessee law.  We therefore remand the determination of how long the prejudgment interest should run to the district court for reconsideration.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court with regard to the breach-of-contract claims, but **REMAND** the case for further consideration of NCI's cross-claims pertaining to prejudgment interest and attorney fees.